# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY C. BROOKS, ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action No. 10-658 |
| v. ) | |
| ) | Chief Judge Gary L. Lancaster |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | Electronic Filing |
| ) | |
| Defendant ) | |

## MEMORANDUM OPINION & ORDER

July 25, 2011

I.  **INTRODUCTION**

Jerry C. Brooks ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 11). The record has been developed at the administrative level. For the following reasons, the decision of the ALJ will be REVERSED and the Commissioner will be directed to award benefits to Plaintiff.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration on August 14, 2007, claiming an inability to work due to disability as of April 1, 2007. (R. at 89)[1]. Plaintiff was initially denied benefits on January 15, 2008. (R. at 63 – 67). A hearing was scheduled for June 12, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 19). A vocational expert also testified. (R. at 19). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on July 1, 2009. (R. at 9 – 18). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on March 20, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint in this court on May 17, 2010. (ECF No. 3). Defendant filed his Answer on August 16, 2010. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 11).

## III. STATEMENT OF THE CASE

*A. General Background*

Plaintiff was born on June 13, 1966, and was forty three years of age at the time of the administrative hearing. (R. at 22). Plaintiff completed the tenth grade, but dropped out of high school thereafter. (R. at 23). Plaintiff was enrolled in special education classes, throughout. (R. at 23, 31). Plaintiff had no post-secondary education. (R. at 23). At the time of the hearing, Plaintiff resided in a structured, therapeutic facility where he received treatment for substance abuse, emotional/psychological issues, and life skills. (R. at 28 – 29). Plaintiff had a marginal work history, and was last employed as a dishwasher for sixteen months. (R. at 22, 129). He did

---

[1] Citations to Doc. Nos. 6 – 6-7, the Record, *hereinafter*, "R. at __."

not have a driver's license, and claimed only to be able to read and write, "to a degree." (R. at 25).

*B. Medical History*

On May 3, 2004, Plaintiff submitted for a disability examination conducted by Sidney Barmak, Ph.D. on behalf of the Pennsylvania Bureau of Disability Determination. (R. at 129 – 32). At the time, Dr. Barmak noted that Plaintiff had two children, but did not care for them. (R. at 129). Plaintiff also lived with a girlfriend, and depended upon her to take care of his finances. (R. at 129 – 32). He helped her clean her apartment, and also took walks with her. (R. at 129 – 32). He often watched television, particularly sports, as well as action and suspense movies. (R. at 129 – 32). He was not social and only traveled to attend appointments. (R. at 129 – 32). He traveled by bus for his examination with Dr. Barmak. (R. at 129 – 32).

At the examination, Plaintiff explained that he was enrolled in special education classes in high school, but dropped out in tenth grade. (R. at 129 – 32). He thereafter worked jobs washing dishes and emptying garbage at restaurants. (R. at 129 – 32). The longest such job was sixteen months in length. (R. at 129 – 32). Plaintiff denied the use of alcohol or drugs, but admitted that he had been arrested and placed on probation for attempted homicide in 1986, and was arrested for simple assault in 1990, but did not serve any time for that offense. (R. at 129 – 32). Dr. Barmak observed that Plaintiff was dressed casually and exhibited good hygiene. (R. at 129 – 32). He was polite and cooperative, established an easy rapport, spoke clearly, was oriented, exhibited no perceptual disturbances, and ambulated without assistance. (R. at 129 – 32). Plaintiff described his mood as "sad and hurtful." (R. at 129 – 32).

Dr. Barmak administered WAIS-III and WRAT-3 tests to assess Plaintiff's intelligence. (R. at 129 – 32). The results of the WRAT-3 revealed reading/word recognition and arithmetic

computation capabilities at a third grade level. (R. at 129 – 32). Dr. Barmak concluded that Plaintiff would require assistance managing any benefits that he may receive. (R. at 129 – 32).

The results of the WAIS-III indicated that Plaintiff had a verbal IQ of 74, a performance IQ of 68, and a full-scale IQ of 69. (R. at 129 – 32). Dr. Barmak noted these results with a 90% confidence interval. (R. at 129 – 32). Overall, the WAIS-III revealed Plaintiff's cognitive functioning to be in the deficient range. The verbal score of 74 showed an average general fund of information for previously acquired everyday knowledge, reflecting a social-educational background and alertness to life and world; showed borderline verbal fluency, numerical reasoning, short-term auditory memory, and social judgment; and, showed deficient abstract verbal reasoning abilities. (R. at 129 – 32). The score of 68 demonstrated low-average processing and abstract reasoning skills; demonstrated borderline ability to comprehend a total social situation in terms of a logical sequence of events; and, demonstrated deficient attention to perceptual detail, deficient psychomotor speed, and deficient spatial visualization ability. (R. at 129 – 32).

On July 30, 2007, Plaintiff sought emergency treatment at UPMC Braddock Hospital, in Braddock, Pennsylvania, after twisting his left knee at his home. (R. at 138). Plaintiff experienced pain and swelling and had an antalgic gait. (R. at 138). An x-ray of the left knee revealed the existence of what was probably a boney cyst. (R. at 139, 150 – 51). An emergency triage assessment completed by a hospital nurse indicated the existence of an advanced directive/ living will for Plaintiff, and that Plaintiff received, "advanced directive information." (R. at 141). The triage assessment also indicated that Plaintiff wished to "make/review/revise/revoke" his advance directive. (R. at 141). A power of attorney for Plaintiff's healthcare decisions was also indicated to exist, apparently naming his grandfather as attorney-in-fact. (R. at 141).

Plaintiff signed a "Consent for Non-Emergent Emergency Department Services." (R. at 146 – 48). However, Plaintiff did not actually complete the form – certain areas meant to be completed by a patient were blank, and others had been filled in by computer/ typewriter. (R. at 146 – 48). Plaintiff was released from the hospital with a knee immobilizer, cane, and prescription for Percocet. (R. at 139 – 40). His final diagnosis was knee sprain and knee cartilage injury. (R. at 144).

Plaintiff was again seen at UPMC Braddock's emergency department for complaints of depression on August 28, 2007 after his girlfriend locked him out of her home. (R. at 156). Plaintiff signed a consent form for treatment. (R. at 174 – 75). Although he complained of suicidal ideation, Plaintiff did not have a specific plan. (R. at 156, 160). Plaintiff admitted to drinking alcohol and using cocaine seven to ten hours before his visit. (R. at 156). He also admitted using marijuana. (R. at 161). A drug screen did not test positive for the presence of cocaine. (R. at 176). Despite his depressed affect, Plaintiff was awake, alert, and oriented. (R. at 157, 166). However, his appearance was dirty and disheveled. (R. at 166). In an emergency triage assessment, it was indicated that Plaintiff did not have an advance directive/ living will, and that he refused "advance directive information." (R. at 161). In an initial psychiatric status assessment, Plaintiff was found to exhibit intact remote and recent memory, and normal intellectual functioning. (R. at 166). Plaintiff's thought processes and affect were also normal. (R. at 167). Yet, his mood was depressed. (R. at 167). Plaintiff was diagnosed with depression and drug abuse. (R. at 157, 173). He was advised to follow up with outpatient therapy. (R. at 173).

Plaintiff began visiting Angela Hauck, L.C.S.W. and Gail Kubrin, M.D. for treatment of diagnosed alcohol dependence and depressive disorder at the Turtle Creek Valley MH/MR, in

Braddock, Pennsylvania. (R. at 198). He had been receiving treatment there since September of 2007. (R. at 198). By about November 6, 2007, Plaintiff had a global assessment of functioning ("GAF") score of 31. (R. at 198). Subsequently, following a parole violation, Plaintiff was admitted to the Allegheny County Jail on November 9, 2007, and was evaluated by Allegheny Correctional Health Services on November 20, 2007. (R. at 200 – 08). Plaintiff's treatment at Turtle Creek Valley MH/MR was noted, as was a history of alcohol abuse beginning at age thirteen, a history of marijuana use beginning at age fourteen, and a history of cocaine abuse beginning at age nineteen. (R. at 200 – 08). A history of diabetes and high cholesterol were also noted. (R. at 200 – 08). Plaintiff's appearance was disheveled, but he had relevant, coherent speech, good ability to relate, good memory, neutral affect, normal thought content, normal perception, normal intelligence, good judgment, fair insight, euthymic mood, and full orientation. (R. at 200 – 08). Plaintiff was diagnosed with major depression, and polysubstance abuse in remission. (R. at 200 – 08). His GAF score was 60. (R. at 200 – 08).

In a mental residual functional capacity ("RFC") assessment completed by state agency evaluator Sharon Becker Tarter, Ph.D. on January 4, 2008, Plaintiff was determined to suffer medically determinable major depression, polysubstance abuse in remission, and mild mental retardation. (R. at 209 – 11). Despite these impairments, Plaintiff was determined to be only moderately limited in his ability to carry out detailed instructions, maintain concentration and attention for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and in responding appropriately to changes in the work setting. (R. at 209 – 11). Plaintiff was not otherwise limited, and was found to be capable of holding competitive employment. (R. at 209 – 11). Dr. Tarter supported her

6

determination by stating that Plaintiff's basic memory processes were intact, he could be expected to complete a normal workweek without exacerbation of psychological symptoms, and he could make simple decisions, could complete repetitive work activities with constant supervision, and was unrestricted in terms of understanding and social interaction. (R. at 209 – 11). In a Psychiatric Review Technique also completed by Dr. Tarter at the same time as the mental RFC assessment, Plaintiff was found to have a valid verbal, performance, or full scale IQ of 60 through 70. (R. at 216).

A physical RFC assessment was completed by state agency evaluator Abu N. Ali, M.D. on January 11, 2008. (R. at 225 – 31). Plaintiff was determined to suffer from medically determinable non-insulin dependent diabetes mellitus, hyperlipidemia, and left knee pain. (R. at 225 – 31). Dr. Ali's findings did not indicate a degree of functional limitation which would preclude Plaintiff from engaging in competitive employment. (R. at 225 – 31).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery,* 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler,* 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

8

expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4). *See Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

V. DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of diabetes mellitus, osteoarthritis, major depressive disorder, and a history of drug and alcohol abuse in remission. (R. at 11). He did not qualify for benefits under any disability listings in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, however. (R. at 13 – 14). It also was determined that Plaintiff was not otherwise disabled because he had the functional capacity to

perform light work not requiring more than incidental postural adaptations, any exposure to hazards such as unprotected heights and dangerous machinery, no more than incidental changes in work processes, no piece work production rate pace, no more than simple, routine, repetitive tasks requiring no exercise of independent judgment or discretion, and allowing for a discretionary sit/stand option. (R. at 14 – 18). Consistent with the testimony of the vocational expert, Plaintiff was capable of performing a significant number of jobs in existence in the national economy. (R. at 17 – 18).

Plaintiff objects to the determination of the ALJ, solely arguing that the ALJ erred in failing to find Plaintiff disabled at Step 3, under Listing 12.05(c) (Mental retardation). (ECF No. 9 at 6). Listing 12.05(c) states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, Listing 12.05. The Court of Appeals for the Third Circuit has read this listing as requiring a claimant to make two showings: (1) that evidence demonstrates subaverage general intellectual functioning with deficits in adaptive functioning prior to a claimant reaching age twenty-two, and (2) that evidence demonstrates an IQ score of 60 – 70 in conjunction with a physical or mental impairment. *Cortes v. Comm'r Soc. Sec.*, 255 Fed. Appx. 646, 651 (3d Cir. 2007); *Stremba v. Barnhart*, 171 Fed. Appx. 936, 938 (3d Cir. 2006). *See also Markle v. Barnhart*, 324 F. 3d 182, 187 (3d Cir. 2003).

In his decision, the ALJ rejected the IQ scores provided by Dr. Barmak, concluding that the objective evidence from the record contradicted the IQ scores, and as a result, Plaintiff did not suffer a severe impairment in intellectual functioning. (R. at 11). The ALJ rejected Dr. Barmak's IQ scores in light of Plaintiff's history of arrests, daily activities with his girlfriend, ability to shop, ability to watch television, and ability to travel by bus. (R. at 11). Further, Plaintiff's awareness of person, place, and time, his ability to maintain an easy rapport with examiners, his basic ability to read and write, his ability to hold a valid identification card, ability to create a power of attorney, sign a consent form for a medical procedure, sign a release against medical advice, receive a prescription for pain medication, and stand trial for criminal matters further demonstrated intellectual functioning inconsistent with IQ scores of 60 – 70. (R. at 11 – 13). Two incidental findings that Plaintiff had "normal" intelligence were also made while Plaintiff was in the emergency room of UPMC Braddock and while at Allegheny Correctional Health Services. (R. at 11 – 13). Following this determination, there was no explicit consideration of listing 12.05(c) by the ALJ.

However, the court finds the ALJ's determination to be without the support of substantial evidence. The holdings of *Markle v. Barnhart*, 324 F. 3d 182 (3d Cir. 2003), and *Morales v. Apfel*, 225 F. 3d 310 (3d Cir. 2000), are instructive, here, and warrant a reversal of the ALJ's decision and an award of benefits to Plaintiff. An ALJ is certainly entitled to reject IQ scores based upon objective medical evidence; however, such rejection may not be based upon personal observations of a claimant or speculative inferences based upon the record. *Markle*, 324 F. 3d at 188; *Morales*, 225 F. 3d at 318 – 19. In *Markle*, the claimant had obtained his GED, could read, write, add, and subtract, went out independently to shop and visit friends and family, took care of his apartment, and managed his own finances. *Id.* at 183. Additionally, the claimant exhibited

good judgment, the ability to function independently, the ability to follow work rules, the ability to relate to co-workers and supervisors, the ability to deal with the public, and a fair ability to deal with work stress and maintain concentration and attention. *Id.* Further, the claimant had a fair ability to understand, remember, and carry out complex and detailed job instructions, had a very good ability to make personal-social adjustments such as demonstrating reliability, maintaining personal appearance, relating predictably in social situations, and behaving in an emotionally stable manner. *Id.* at 184. The Court of Appeals did not find these attributes to be inconsistent with a determination that the claimant had a verbal IQ of 73, performance IQ of 72, and full scale IQ of 70, indicating he was cognitively challenged. *Id.*

The ALJ in *Markle* concluded that the aforementioned attributes and activities invalidated the claimant's IQ scores. The Court of Appeals disagreed, finding that the lack of professional psychological or medical opinion contradicting the IQ scores, and the lack of doubt as to the validity of the IQ scores by the doctor assessing the claimant, overwhelmed the ALJ's non-medical observations based upon the record. *Id.* at 187 – 88. The *Markle* court went on to cite a Sixth Circuit case which rejected that an IQ score of 68 was inconsistent with, "among other things, [claimant's] driver's license and work history as a truck driver," as support. *Id.* (citing *Brown v. Sec'y of HHS*, 948 F. 2d 268, 270 (6th Cir. 1991)). The Court of Appeals further noted that proper rejection of IQ scores occurred in cases wherein the claimant worked in the private sector, had a driver's license, was the primary caretaker of a young child, and completed the ninth grade without special education courses, and wherein another claimant had a two year college degree, was enrolled in a third year of college, had a history of skilled jobs, and had taught algebra. *Id.* (citing *Clark v. Apfel*, 141 F. 3d 1253, 1255 (8th Cir. 1998); *Popp v. Heckler*, 779 F. 2d 1497, 1499 (11th Cir. 1986)).

In the present case, it must be noted that Plaintiff never actually signed any Release Against Medical Advice, despite the ALJ's contention otherwise. (R. at 149, 163). It also must be noted that Plaintiff did not complete the entirety of his medical consent forms, only signing where indicated by an "X" mark. (R. at 146 – 48, 174 – 75). The ALJ provided a medical conclusion he was not qualified to make by stating that a person with an IQ of 60 – 70 would not have been prescribed Percocet for pain management. There is no objective evidence to support such a statement.

The ALJ made unfounded assumptions about the existence of, and circumstances surrounding the alleged creation of, a power of attorney document for Plaintiff. In the first place, the evidence on record is equivocal, at best. It shows that at a July visit to the emergency room in 2007, hospital staff noted the existence of an advance directive/ living will and/or power of attorney for Plaintiff. (R. at 141). The following month – August of 2007 – the staff at the same hospital indicated that no such documents existed. (R. at 161). In the second place, the ALJ provided no proof that Plaintiff was adjudged incompetent to represent his own interests and was therefore incapable of executing either of the above documents, or that a person with an IQ of 60 – 70 could not have executed such documents.

There is no evidence on record that any of those documents actually existed, and there is no evidence explaining the creation of such documents. As such, the ALJ's conclusions regarding these documents were pure speculation, at best. There is also no objective evidence on record which supported the ALJ's assertion that a person with an IQ of 60 – 70 could not function independently, as Plaintiff did, nor stand trial for criminal offenses, as Plaintiff did. The

ALJ provided no evidence to support his assumption that an IQ of 60 – 70 would render an individual incompetent to stand trial.

However, most persuasive of all – irrespective of the ALJ's failure to produce objective evidence indicating that a person with an IQ of 60 – 70 could not have done the things Plaintiff did – was his failure to cite objective medical evidence which contradicted Dr. Barmak's IQ scores. *See Markle*, 324 F. 3d at 187; *Morales*, 225 F.3d at 318. Dr. Barmak indicated his scores with 90% confidence. (R. at 129 – 32). He also explicitly found that, based upon objective medical testing, Plaintiff had the mathematics and reading skills of a third grade student. (R. at 129 – 32). Further, in her Psychological Review Technique, state agency evaluator Dr. Tarter explicitly acknowledged the validity of these scores. (R. at 216). Her RFC assessment also included a finding of mild mental retardation. (R. at 209 – 11).

While it was noted at UPMC Braddock and Allegheny Correctional Health Services in check-box forms – without further elaboration – that Plaintiff exhibited "normal" intellectual functioning, this is not sufficient to constitute substantial evidence. (R. at 166, 202). Such forms carry little evidentiary weight. *Mason v. Shalala*, 99 F. 2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. [W]here these . . . 'reports are unaccompanied by thorough written reports, their reliability is suspect.'") (internal citations omitted). The findings do not necessarily even contradict Dr. Barmak's IQ results, as there was no further explication of what was meant by, "normal," intelligence, or what methods were utilized to determine that Plaintiff's intelligence was, in fact, "normal." The clear weight of evidence on record favors Plaintiff, here.

Having provided the requisite IQ, Plaintiff also clearly satisfied the requirement for a concurrent severe impairment. Similarly to *Markle*, the ALJ here determined that Plaintiff

14

suffered medically determinable severe impairments, including diabetes, osteoarthritis, depression, and a history of substance abuse in remission. (R. at 11); *Markle*, 324 F. 3d at 187 – 88). The ALJ went on to find that these impairments restricted Plaintiff to a limited range of light work. (R. at 14); *Id.* This is sufficient to satisfy Listing 12.05(c)'s requirement of a physical or other mental impairment imposing additional and significant work-related limitations. *Id.* (citing 65 Fed. Reg. 50746, 50772).

Lastly, the ALJ improperly assumed that Plaintiff did not provide adequate evidence of intellectual impairment prior to age twenty-two. (R. at 11). This is incorrect. The record indicated that Plaintiff dropped out of high school after tenth grade, despite enrollment in special education classes. (22 – 23). Plaintiff never obtained his GED. (R. at 22 – 23). Additionally, Plaintiff had a limited, sporadic work history. (R. at 16). There were no objective medical findings indicating that Plaintiff's intellectual deficiencies occurred other than prior to age twenty-two. *See Markle*, 324 F. 3d at 188 – 89. Unlike the case in *Markle*, the ALJ here did discuss the evidence regarding whether Plaintiff's intellectual deficiencies occurred prior to the required age under Listing 12.05(c). *Markle*, 324 F. 3d at 188 – 89. The ALJ failed provide evidence to bolster his position contradicting Plaintiff's evidence regarding the existence of his mental deficiency prior to age twenty-two. As in *Markle*, however, the evidence here is clearly "consistent with a finding that [Plaintiff's] mental condition remained constant from childhood through the present." *Id.* The ALJ's determination otherwise was unsupported by substantial evidence, and Plaintiff clearly met his burden of satisfying Listing 12.05(c).

The only remaining issue is whether the case should be remanded to the Commissioner or reversed with a direction to award benefits to Plaintiff. *Morales*, 225 F. 3d at 320. "[T]he decision to . . . award benefits should be made only when the administrative record has been

15

fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id.* (quoting *Podedworny v. Harris*, 745 F. 2d 210, 222 (3d Cir. 1984)). It is clear from the evidence that Plaintiff's IQ scores and severe impairments met the requirements of Listing 12.05(c). It is also clear that Plaintiff's mental deficiencies had origins prior to his reaching the age of twenty-two. Remand is, therefore, unnecessary.

## VI.  CONCLUSION

Based upon the foregoing, substantial evidence supported Plaintiff's disability under Listing 12.05(c). Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment is granted, Defendant's Motion for Summary Judgment is denied; and, the decision of the ALJ is reversed and the Commissioner directed to award benefits to Plaintiff.

Gary L. Lancaster
Chief United States District Judge

cc/ecf: Lindsay Fulton Osterhout, Esq.
521 Cedar Way
Suite 200
Oakmont, PA 15139
(412) 794-8003

Lee Karl, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500